IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**BRANDON LAVON ARTIS,**

    Plaintiff,

v.                                                          Civil Action No. **3:18CV795**

**K. THOMAS,** *et al.,*

    Defendants.

**MEMORANDUM OPINION**

Brandon Lavon Artis, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this 42 U.S.C. § 1983 action. The action proceeds on Artis's Particularized Complaint ("Complaint," ECF No. 16).[1] Artis named as defendants: James Beale, the former Warden of Lawrenceville Correctional Center ("LCC") ("Warden Beale") and K. Thomas ("CO Thomas"), a former correctional officer at LCC. By Memorandum Order entered on February 22, 2021, the Court dismissed all claims against CO Thomas because Artis failed to serve her in a timely manner. (ECF No. 56, at 5.) By that same Memorandum Order the Court denied Warden Beale's initial Motion for Summary Judgment without prejudice. (*Id.* at 7.) The matter is before the Court on Warden Beale's Second Motion for Summary Judgment. (ECF No. 57.) Artis has responded. (ECF No. 59, 61.) For the reasons stated below, the Motion for Summary Judgment will be GRANTED.

**I. Artis's Complaint and Claims**

Artis was an inmate confined in LCC. (Compl. ¶ 3.) On July 5, 2017, CO Thomas ordered

---

[1] The Court employs the pagination assigned to the parties' submissions by the CM/ECF docketing system. The Court corrects the capitalization, punctuation, and spelling in the quotations from Artis's submissions.

Artis and his cell-mate to leave their cell. (*Id.* ¶ 8.) According to Artis, CO Thomas entered his cell, closed the door, and "ordered the Plaintiff to watch her as she made sexual gestures." (*Id.* ¶ 9.) "As Plaintiff watched through the translucent window" of his cell door, "Defendant K. Thomas sat down on Plaintiff's mattress and masturbated her vaginal area until" she had an orgasm. (*Id.* ¶ 10.) Artis immediately called the Prison Rape Elimination Act ("PREA") hotline and reported what happened. (*Id.* ¶ 11.)

Thereafter, CO Thomas's superior, Lieutenant Queensberry, directed Artis to withdraw his PREA complaint. (*Id.* ¶ 13.) When Artis refused to withdraw the complaint, Queensbery and Thomas told Artis, "'We are going to get you and you better watch your back." (*Id.* ¶ 14.)

On July 10, 2017, CO Thomas wrote Artis up on a "fabricated charge." (*Id.* ¶ 15.)

On July 17, 2017, as Artis was leaving a class, CO Thomas told Artis that he needed to consent to her searching him. (*Id.* ¶ 16.) CO Thomas then searched Artis and grabbed his penis and testicles. (*Id.* ¶ 17.)

Between July 5, 2017, and December 2017, Artis made several PREA complaints with respect to CO Thomas and made several reports of retaliation by CO Thomas and other staff members. (*Id.* ¶ 18.) Warden Beale "disregarded all of the complaints submitted by Plaintiff." (*Id.*) "Warden Beale allowed Defendant Thomas to work in the same vicinity as Plaintiff while an open PREA investigation was in effect." (*Id.* ¶ 20.) "Defendant Warden Beale failed to address the serious matter at hand and ignored all complaints. Defendant Warden Beale showed complete disregard to all the repetitive abuse by his staff." (*Id.* ¶ 27.)

Based on the foregoing, Artis makes the following claims against Warden Beale:

| | |
|---|---|
| Claim 1 | Warden Beale violated Artis's rights under the Eighth Amendment by failing to protect Artis from sexual abuse by CO Thomas. (*Id.* ¶¶ 32–33.) |
| Claim 2 | Warden Beale violated Artis's right to substantive due process by ignoring |

2

|   |   |
|---|---|
|   | Artis's PREA complaints thus "subjecting Plaintiff to [a] substantial risk of serious harm." (*Id.* ¶ 36.) |
| Claim 3 | Warden Beale violated Artis's right to substantive due process by failing to keep CO Thomas and Artis separated while the PREA investigation was being conducted thus "subjecting Plaintiff to [a] substantial risk of serious irreparable harm." (*Id.* ¶¶ 37–38.) |

"[I]t is now well established that the Eighth Amendment 'serves as the primary source of substantive protection to convicted prisoners,' and the Due Process Clause affords a prisoner no greater substantive protection 'than does the Cruel and Unusual Punishments Clause.'" *Williams v. Benjamin*, 77 F.3d 756, 768 (4th Cir. 1996) (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)). Thus, the Court will evaluate Artis's substantive due process claim under the Eighth Amendment.

## II. Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

3

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A mere "*scintilla* of evidence," however, will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

As relevant here, in support of his Second Motion for Summary Judgment, Warden Beale submits: (1) the Declaration of Lucas Kuser, a correctional officer at LCC ("Kuser Decl.," ECF No. 58-1); Beale's Declaration ("Beale Decl.," ECF No. 58-2); a January 31, 2019 PREA report (ECF No. 58-3); and, a number of institutional records from LCC that the Court cites to by their CM/ECF designation.[2]

In response, Artis submitted an unsworn, notarized memorandum and copies of his institutional grievance records.[3] Artis's Complaint is sworn to under penalty of perjury.

---

[2] Because the Court rejects Artis's claims on the merits, the Court omits any reference to Warden Beale's submissions related to the defense of lack of exhaustion.

[3] Although Artis's memorandum bears a notary's seal and was acknowledged before a notary, it does not contain a jurat. An acknowledgement is used to verify a signature and to prove that an instrument was executed by the person signing it, whereas a jurat is evidence that a person has sworn as to the truth of the contents of the document. In an acknowledgement, unlike a jurat, the affiant does not swear under oath nor make statements under penalty of perjury. *See Strong v.*

4

In light of the foregoing submissions and principles, the following facts are established for purposes of the Motion for Summary Judgment. The Court draws all permissible inferences in favor of Artis.

### III. Summary Judgment Evidence

#### A. The Initial Incident

On July 8, 2017, Lucas Kuser, was employed as a Correctional Officer ("CO") at LCC. (Kuser Decl. ¶ 1.) On that date, CO Kuser was working as the booth officer in Artis's housing unit. (*Id.* ¶ 4.) CO Kuser observed several inmates congregating around the cell 63-201, the cell that Artis shared with Jason Ortega. (*Id.*) CO Kuser activated the intercom for cell "63-201 and heard what sounded like inmate(s) smoking inside the cell." (*Id.*)

CO Kuser contacted CO Thomas and asked that she perform a cell check of Artis's cell. (*Id.* ¶ 5.) CO Thomas entered the cell, ordered Jason Ortega out of the cell and closed the cell door for her safety. (*Id.* ¶ 6.) While CO Thomas was in the cell, CO Kuser paid close attention to the cell door and the intercom to ensure the safety of CO Thomas. (*Id.*) "After less than 5 minutes, K. Thomas emerged from Artis' cell holding a cup with tattoo needles and other contraband." (*Id.* ¶ 5.)

CO Kuser swears:

> At all times [he] was able to hear what transpired within the cell. [He] paid careful attention to the cell intercom, listening for any indication that Ofc. Thomas needed assistance. Had Ofc. Thomas made any statements, or if any other noise had been made within the cell, [he] would have heard it, just as [he] was able to hear what in retrospect was apparently tattoo paraphernalia in use.
> [He] did not hear Ofc. Thomas make any statements of a sexual nature or otherwise commit sexual acts while within [Artis's] cell 63–201.
> In total, Ofc. Thomas was in the cell for less than 5 minutes.

---

*Johnson*, 495 F.3d 134, 140 (4th Cir. 2007) (explaining that a jurat uses words "subscribed and sworn" and demonstrates an oath was rendered); *Goode v. Gray*, No. 3:07cv189, 2009 WL 255829, at *2 n.6 (E.D. Va. Feb. 3, 2009). Thus, the memorandum fails to constitute admissible evidence.

5

(*Id.* ¶¶ 7–9 (paragraph numbers omitted).) CO Kuser further avers that

> it would have been physically impossible for Ofc. Thomas to have (i) responded to cell 63-201, (ii) ushered inmates in the vicinity into the dayroom, (iii) performed a search of the cell uncovering tattoo paraphernalia and other contraband, (iv) disrobed, and then (5) sexually gratified herself within Artis' cell. When exiting the cell, Ofc. Thomas did not appear disheveled and did not behave erratically.

(*Id.* ¶ 10.)

Each cell at LCC "is equipped with a small window for purposes of facilitating observations of inmate activities within the cell." (*Id.* ¶ 11.) CO Kuser swears that, during the search of Artis's cell, "all offenders were required to congregate in the day room, down two flights of stairs, for the duration of the search. Artis was not permitted, and did not, stand at the window and watch Ofc. Thomas within his cell. Consequently, Artis's contention that he . . . watched while Ofc. Thomas gratified herself is false." (*Id.* ¶ 11.)

### B.     The Investigation and Subsequent Events[4]

On July 10, 2017, Warden Beale was notified that Artis had placed a call to the PREA

---

[4] Defendant Beale concedes that,

> the PREA Report is confusing because there were, in essence, two phases to this investigation that occurred precisely 365 days apart. The initial PREA Hotline complaint was made on July 10, *2017*. According to the PREA Report, Inv. Kellett immediately initiated an investigation. Between July 11, 2017 and August 9, 2017, Inv. Kellett interviewed Artis, Ofc. Thomas, and a confidential inmate informant. An [Officer of Professional Responsibility ("OPR")] referral was made for Ofc. Thomas, and the locality was authorized by OPR to investigate.
> 
> Thereafter, very little happened until Investigator [Sleffel] resumed the investigation of July 11, *2018*. Ofc. Kuser and Lt. Queensbury were both interviewed on that date. Inv. Sleffel eventually completed a [PREA] report dated January 31, 2019 summarizing his findings and concluding that Artis's complaint was unsubstantiated.

(ECF No. 58, at 5 n.1.)

6

hotline. (Beale Decl. ¶ 5.) Although Warden Beale is notified as a matter of course anytime an inmate files a complaint regarding assaultive or sexual contact between an inmate and staff, he "delegated the investigation of such complaints to the Office of Professional Responsibility ("OPR")." (*Id.* ¶ 6.)

Investigator Greg Kellett interviewed Artis on July 21, 2017, and provided the following information, which was recorded in the PREA Report:

> Artis stated on 7/8/17, Thomas entered his cell and told him, "I am about give you some pussy," Artis said he replied, "Hell no." Artis said Thomas told him to, "Watch and see." Artis said Thomas closed his cell door, Artis stated he left the cell and watched her from outside his cell through the cell window, as Thomas unbuckled her belt, and began to masturbate. Artis said he left the area. Artis stated he was fondled during a pat search; however, no date range was given. Artis stated Thomas wrote disciplinary infraction charges against him.
> . . . .
> Artis also alleged in his statement, on 7/10/17 Thomas asked him again for sex, but he stated, "Leave me alone." Artis stated on 7/17/17, Thomas "Licked her tongue at me" and sexually assaulted him outside of vocational electric trade class by "grabbing and groping my penis, sexually rubbing my legs, ass, back, chest and neck. Artis stated when he looked back; Thomas again licked her lips at him. Artis stated on 7/20/17, he was sexually abused again and told him he was being moved that night, (**Note:** Housing records indicate no move was made.)

(PREA Report 2.)

Investigator Kellett interviewed Correctional Officer Thomas on July 28, 2017, and recorded the following information in the PREA Report:

> Thomas stated she was advised by Kuser inmates were smoking in 63 pod. She said she went to the cell and there were multiple (nonspecific, does not recall identities) inmates standing in the area. Thomas said Artis asked her, "What you going to my cell for."
> Thomas said Ortega was inside the cell sitting on the bed and she ordered him out of the cell, so she could search for contraband. Thomas said Artis continued to question her about going to his cell and she told him to step back.
> Thomas said she closed the cell to do a cell search. She said she looked through both offender's property and found an ice cream cup filled with what appeared to be tattoo gun parts. She said when Artis observed her with the cup, Artis said, "I'm going to pound 55 (inmate PREA Reporting Hotline) her ass and get her outta here and say she in the cell playing with herself." Thomas said she

7

> reported the incident and Artis' statement to her supervisor, Sergeant (Sgt.) Alisa Goode. Goode told her to write an incident statement of what occurred, and she stated she did so. (**Note:** No record of her statement exists. Goode has not worked at the facility since 8/4/17 and is unavailable to interview).
> Thomas said she completed the incident statement and took it to Queensberry. Thomas said Queensberry spoke with Artis about what happened.

(*Id.* at 3–4.)

Also, a confidential inmate informant was interviewed on August 9, 2017 and October 11, 2017, by Investigator Kellett. (Beale Decl. ¶ 10; PREA Report 3.) The informant corroborated CO Thomas's account of the limited time she spent in the cell and the fact that she found tattoo needles in Artis's cell. (PREA Report 3.) The informant asked Artis why he had made the accusations against CO Thomas and Artis responded because "Thomas was 'down on' (upset with) him (Artis)." (*Id.*) Sometime after October 11, 2017, Investigator Kellett left his employment with LVCC and the investigation lapsed. (*Id.*) On February 2, 2018, Artis was transferred from LVCC to another institution. (*Id.* at 2.)

On July 11, 2018, Investigator Sleffel resumed the investigation. (*Id.* at 3.) On that date, he interviewed CO Kuser. (*Id.*) CO Kuser provided a statement largely consistent with his declaration submitted in conjunction with the Second Motion for Summary Judgment. (*Id.*; Kuser Decl.) Investigator Sleffel completed his PREA investigation and issued his PREA Report on January 31, 2019. In the PREA Report, he concluded that, based on preponderance of the evidence, Artis's allegations of sexual abuse were unsubstantiated. (*Id.* at 1, 4.) This conclusion was based on the facts that: CO Thomas denied the allegations; CO Kuser confirmed that he did not hear anything over the intercom; Thomas returned from the cell with tattoo paraphernalia; and the inmate informant stated Artis made the charges against Thomas because Thomas was down on him. (*Id.* at 4.) The PREA Report also acknowledge the following shortcomings:

8

**STAFF FAILURE ANALYSIS**
Timeliness of investigation
Grievance/Hotline call/Informal complaints not properly addressed
Separation memo not completed or issued.

(*Id.*)

### C. Separation of Artis and Thomas During the PREA Investigation and Warden Beale's Knowledge of the Same

Warden Beale swears that:

> I understand that Artis has alleged that I failed to protect him from repeated assaults by C/O Thomas. This is incorrect. C/O Thomas was not assigned to 60 Building during the pendency of [the PREA] investigation. The Command Staff were instructed to keep C/O Thomas and Artis separated.
> According to Artis' grievance records, on July 22, 2017, C/O Kuser wrote Artis a charge for being in an unauthorized area. In his defense, Artis claimed that Captain Stith instructed him to move into the unauthorized area to avoid contact with C/O Thomas. This charge was subsequently dismissed.
> . . . .
> It was at all relevant times and remains my understanding that Ofc. Thomas and Artis were separated during the pendency of the PREA investigation into his complaints of sexual abuse. There may have been incidental contact between Ofc. Thomas and Artis in highly trafficked areas of the facility. On one such occasion, Artis complained about being disciplined after being instructed by Cpt. Stith to leave an area occupied by Ofc. Thomas, Cpt. Stith's effort to separate Artis and Ofc. Thomas on this occasion is precisely how Correctional Officers at LVCC were trained to handle these instances.
> Notwithstanding these protections, the OPR investigation reflects that Artis' allegations are not credible. The Booth Officer's monitoring of Artis' cell is a practice enforced specifically to protect inmates like Artis from improper conduct and to inoculate officers like Ofc. Thomas against specious allegations of wrongdoing. Ofc. Kuser neither heard nor observed any sexually inappropriate behavior. A confidential inmate reported that Artis admitted his sexual assault allegations were false.
> For all of these reasons, I believed at all relevant times and continue to believe that LVCC correctional officers implemented appropriate measures to protect Artis during the pendency of the PREA investigation.

(Beale Decl. ¶¶ 12, 13, 17–19 (paragraph numbers omitted).)

9

## IV. Analysis

When a convicted inmate challenges his conditions of confinement, he must show "(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991) (citations omitted). Under the objective prong, the inmate must demonstrate that the deprivation complained of was extreme and amounted to more than the "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (4th Cir. 1993) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). Nevertheless, "[t]here can be little doubt that sexual abuse is repugnant to contemporary standards of decency, and that allegations of sexual abuse can amount to an Eighth Amendment violation." *Jackson v. Holley*, 666 F. App'x 242, 244 (4th Cir. 2016) (citing *Woodford v. Ngo*, 548 U.S. 81, 118 (2006) (Stevens, J., dissenting)).

The subjective prong of an Eighth Amendment claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing

10

*Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm. . . . [and] that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)). In this regard, "an official who responds reasonably to a known risk has not 'disregard[ed] an excessive risk to inmate health or safety,' *Farmer*, 511 U.S. at 837, and has therefore not acted with deliberate indifference." *Brown v. Harris*, 240 F.3d 383, 389–90 (4th Cir. 2001) (alteration in original, parallel citation omitted, citations omitted).

Before July 11, 2017, Warden Beale had no knowledge that Artis was at any risk of being sexually assaulted by CO Thomas. After that date, Warden Beale was aware that Artis had filed a PREA complaint. Warden Beale believed, per the operating policy at LCC, that the complaint would be investigated and CO Thomas and Artis would be separated during the pendency of the investigation. The record reflects that CO Thomas was not assigned to Artis's building during the investigation and correctional staff attempted to keep CO Thomas and Artis separated during the pendency of the investigation. Artis has failed to submit evidence that reflects that during the course of the investigation, Warden Beale was alerted that CO Thomas was allegedly continuing to harass him and had access to his person. Artis fails to demonstrate that Warden Beale acted with deliberate indifference by failing to protect him from sexual abuse by CO Thomas or acted with deliberate indifference to the need to keep him separated from CO Thomas during the course of the PREA investigation. Accordingly, Claims 1 and 3 will be DISMISSED.

In Claim 2, Artis contends that Warden Beale "subject[ed] Plaintiff to substantial risk of serious harm," by ignoring Artis's PREA complaints. As noted above, Warden Beale believed

that Artis's PREA complaint was being investigated. Artis fails to direct the Court to record evidence showing he alerted Warden Beale that the investigation had lapsed or that CO Thomas was continuing to harass him. Accordingly, Artis fails to demonstrate that Warden Beale acted with deliberate indifference to his PREA complaints. Claim 3 will be DISMISSED.

## V. Conclusion

"[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there." *Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) (citing *Incumaa v. Ozmint*, 507 F.3d 281, 286–87 (4th Cir. 2007); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); *Taylor v. Rogers*, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986)). Artis is no longer incarcerated in the LCC. Accordingly, Artis's claims for declaratory and injunctive relief will be DISMISSED AS MOOT.

Artis's claims will be DISMISSED. Warden Beale's Second Motion for Summary Judgment (ECF No. 57) will be GRANTED. The action will be DISMISSED.

An appropriate Order will accompany this Memorandum Opinion.

Date: 2 September 2021
Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge

12